UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

## 07 CIV. 3160

THE STATE OF NEW YORK AND
THE NEW YORK STATE DEPARTMENT OF
ENVIRONMENTAL CONSERVATION

**ROBINSON**

                        **Plaintiffs,**

          **-against-**

HSBC BANK USA, N.A.,

                        **Defendant.**

:
:
:  **COMPLAINT**
:
:  **Civil Action No.:**
:  **Honorable**
:
:

Plaintiffs the State of New York (the "State") and the New York State Department of

Environmental Conservation ("DEC"), by their attorney, Andrew M. Cuomo, Attorney General

of the State of New York, hereby allege as follows:

## PRELIMINARY STATEMENT

1.  This action is brought pursuant to the Comprehensive Environmental Response,

Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, as amended by the

Superfund Amendments and Reauthorization Act of 1986 ("SARA"), and the Asset

Conservation, Lender Liability, and Deposit Insurance Act of 1996 ("ACA"); the Declaratory

Judgment Act, 28 U.S.C. § 2201; and Articles 17, 27, 37 and 71 of the New York Environmental

Conservation Law ("ECL") and the regulations promulgated thereunder, Title 6 of the New York

Code of Rules and Regulations ("NYCRR").

2.  The State seeks to recover (1) civil penalties for violations of law, and (2) the

costs incurred by the State in responding to releases and threatened releases of hazardous

substances to the environment at a chemical manufacturing facility known as the Westwood

Chemical Corporation located on Tower Drive in the Town of Wallkill in the State of New York

(the "Site"). The State seeks judgment, *inter alia*, requiring the defendant to reimburse the State for its costs incurred and to be incurred in responding to such releases and threatened releases, and to pay civil penalties for violations of New York law.

## JURISDICTION AND VENUE

3.     This Court has federal question jurisdiction over the claims arising under CERCLA pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1331; and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

4.     Venue is proper in this district pursuant to CERCLA, 42 U.S.C. § 9613(b), and 28 U.S.C. § 1391(b), because the claims asserted arose in, and the threatened and actual releases of hazardous waste and hazardous substances occurred within, this judicial district.

## PARTIES

5.      Plaintiff, the State of New York, is a body politic and a sovereign entity, and asserts its claims on behalf of itself and as *parens patriae*, guardian, and representative of the citizens of New York.

6.     DEC is an agency of the State of New York and is responsible for enforcing the environmental laws of the State, for responding to threats posed by the disposal and release of hazardous waste and hazardous substances to the environment, and for protecting human health and the environment.

7.     Defendant HSBC Bank USA, N.A. ("HSBC") is a national financial banking and lending institution doing business in the State of New York with its principal place of business at 452 Fifth Avenue, New York, New York.

## STATUTORY AND REGULATORY FRAMEWORK

8.      CERCLA Section 107(a), 42 U.S.C. § 9607(a), provides that an owner and/or operator of a facility at which hazardous substances have been disposed, released or threatened to be released to the environment, shall be liable for state and federal response costs incurred not inconsistent with the National Contingency Plan, 40 C.F.R. Part 300. An "operator" includes a person who controlled the activities at a facility at the time hazardous substances were disposed, released, or threatened to be released to the environment. 42 U.S.C. § 9601(20)(A).

9.      CERCLA Section 101(20), 42 U.S.C. § 9601(20)(E) and (F), exempts from the definition of "operator," and therefore exempts from CERCLA liability, any lender that did not "participate in management" of a facility at which hazardous substances have been disposed. "Participation in management" is defined to mean a person who actually participates in the management or operational affairs of the facility, but does not include merely having the capacity to influence or control the facility. 42 U.S.C. § 9601(20)(F)(i)(I) and (II).

10.     In the case of a lender, participation in management is defined to include a person or entity (1) who exercises decision-making control over the environmental compliance related to the facility and has undertaken responsibility for the hazardous substance handling or disposal practices, or (2) who exercises control of the facility and has manifested responsibility for the overall management of the facility encompassing day-to-day decision-making with respect to environmental compliance, or has manifested responsibility over all or substantially all of the operational functions of the facility other than the function of environmental compliance. 42 U.S.C. § 9601(20)(F)(ii)(I) and (II).

11.    CERCLA also sets forth certain activities that a lender may undertake to protect its security interest without being considered an "operator" for purposes of imposing liability. CERCLA thereby creates a "safe harbor" for lenders, but restricts the acceptable activities to those listed. 42 U.S.C. § 9601(20)(F)(iv).

12.    ECL §§ 27-0913 and 27-0914 prohibit the disposal of "hazardous waste" except at a properly permitted facility and impose certain operational requirements on those generating or storing hazardous waste. ECL § 27-0907 and DEC's regulations, 6 NYCRR § 373-3.3, set forth the operational requirements for persons generating, handling, treating, storing, and/or disposing of hazardous waste. ECL § 27-0901(3) defines hazardous waste to include waste, which because of its quantity, concentration, or physical or chemical characteristics, may (a) cause or significantly contribute to an increase in mortality or serious irreversible or incapacitating illness; or (b) pose a substantial present or potential hazard to human health or the environment when improperly handled, treated, stored, transported, disposed of, or otherwise managed.

13.    ECL § 71-2705 imposes liability for civil penalties on any person who violates ECL §§ 27-0907, 27-0913 and/or 27-0914 or any regulation promulgated thereunder. ECL § 71-2705 empowers the Attorney General to seek injunctive relief and civil penalties for violations of ECL Article 27.

14.    ECL § 37-0107 prohibits the disposal or release of "hazardous substances" to the environment. ECL § 37-0103(1)(a) and DEC's regulations, 6 NYCRR § 596.1(c)(19), define hazardous substances to mean all hazardous substances listed in 6 NYCRR Part 597.

15.    ECL § 71-3703 imposes liability for civil penalties on any person who violates ECL § 37-0107 by disposing of and/or releasing hazardous substances to the environment.

4

16.     ECL §§ 71- 2705 and 71-3703 empower the Attorney General to seek injunctive relief and civil penalties for violations of ECL Article 37.

17.     ECL § 17-1743 requires any person with actual or constructive possession of chemical liquids in excess of 1,100 gallons, which, if released would likely pollute the lands and waters of the State, including groundwater, to notify DEC of any release, discharge or spill of such chemical liquids.

18.     ECL § 71-1941 imposes liability for civil penalties on any person who violates ECL § 17-1743 in failing to report the release, discharge, or spill of chemical liquids to the land and waters of the State.  ECL § 71-1941 empowers the Attorney General to seek injunctive relief and civil penalties for violations of ECL § 17-1943.

## STATEMENT OF FACTS

### Westwood Chemical Corporation

19.     Westwood Chemical Corporation ("Westwood"), is a New York corporation with its principal place of business at the Site.  Westwood manufactured chemical products for sale and distribution throughout the United States.  Westwood generated hazardous substances and hazardous waste as a part of its manufacturing business.

20.     Westwood did business on a nine-acre site ("the Westwood Site") within a 52,000 square-foot building containing offices, laboratories, manufacturing areas, and a warehouse. There were numerous chemical storage tanks and containers within and outside the building, some of which hold between 55 and 20,000 gallons of various chemical substances.

21.     Westwood manufactured and marketed chemicals for the cosmetic industry, including antiperspirant compounds containing aluminum chlorhydrate as an active ingredient.

5

The manufacturing process for the cosmetic antiperspirants involves the use of aluminum chlorhydrate, hydrochloric acid, and other chemicals. This manufacturing process created thousands of gallons of wastewater containing aluminum, iron chlorides, and other hazardous substances, which by law required proper handling, treatment, storage, and off-site disposal.

22.     In addition, Westwood manufactured and marketed chemicals for the water treatment industry known as aluminum coagulants. Westwood's water treatment manufacturing process produced significant quantities of solid and hazardous waste and hazardous substances, including laboratory waste, off-specification chemical products, wastewater, and rejected raw material product batches, all of which by law required proper handling, treatment, storage and off-site disposal.

23.     During the time it operated, Westwood was subject to several environmental laws and regulations, including those governing water pollution, air pollution, solid and hazardous waste storage and disposal, and underground and chemical bulk storage. Westwood did not have a permit to store or dispose of hazardous waste or hazardous substances at the Site.

24.     On or about October 25, 2004, Westwood ceased manufacturing and all other operations at the Westwood Site and laid off its employees. When operations ceased, Westwood left behind and otherwise abandoned, disposed and released hazardous substances and hazardous wastes to the environment at the Site.

**HSBC Bank USA, N.A.**

25.     On or about August 8, 2002, Westwood's president and chief executive officer, Emma B. Masset, executed documents for a fixed rate loan from HSBC for $2.57 million, and a line of credit for $1.5 million. The loan and line of credit were secured by a mortgage and lien

on the real property and improvements at the Westwood Site, and on other Westwood assets, including rents, leases, accounts receivables, furniture, equipment and personal property. Masset utilized the HSBC loan to fund Westwood's operations, among other things.

26.     During 2003, Westwood defaulted on its loan payments to HSBC. On or about March 8, 2004, HSBC notified Westwood by letter that it was in default. On or about June 3, 2004, HSBC again notified Westwood by letter that it was in default on the loan.

27.     In or about late July 2004, HSBC changed Westwood's cash management, accounts receivable and accounts payable systems. HSBC sent letters to Westwood's customers, signed by Masset, that directed them to make all future payments on accounts receivables directly to HSBC rather than to Westwood. Thereafter, Westwood's customers made payments to HSBC. The new cash management system set up by HSBC for Westwood was known as a "lock box," and was under HSBC's exclusive control at its New York City office, rather than at the Middletown branch office where Westwood usually did its banking. No payments or withdrawals from the lock box could be made by Westwood without HSBC approval. HSBC advised Westwood in writing that the money received from Westwood's customers would be available to Westwood "on a daily basis based upon reasonable requests for normal and customary operating expenses." From about early August, 2004 to November 2004, Westwood requested, and HSBC approved, payments from the lock box account for operating costs.

28.     On or about October 12, 2004, HSBC exercised its rights under the loan agreement and seized Westwood's operating cash from the lock box without notice to Westwood's management. Thereafter, HSBC refused to approve funding for Westwood's operations without detailed requests. Westwood submitted for approval to HSBC several

7

detailed requests for operating expenses, including payroll, utilities, taxes, pension plan

payments, insurance, and raw materials for production. During that time, HSBC repeatedly

demanded that Westwood file for bankruptcy.

### Plan for the Orderly Shut Down of the Westwood Facility

29.    After HSBC seized Westwood's operating funds, HSBC asked Westwood's

management to prepare a plan for the "orderly shut down" of the facility. On or about October

18, 2004, Westwood submitted a written shut down plan (the "Plan") to HSBC that contained,

among other things, specific information related to the disposal of wastewater, hazardous waste,

and other solid waste accumulated at the Site, and the costs related to such measures. The Plan

identified 215,785 gallons of wastewater, 30 drums of hazardous waste, and miscellaneous test

samples that all required proper off-site disposal. The Plan set forth the disposal costs of

approximately $39,200 for the wastewater, $10,500 for the hazardous waste, and $1,000 for the

laboratory test samples. The Plan identified raw chemical materials that should be inventoried

for sale or returned to vendors. The Plan also identified the costs associated with completing

"work in progress," that is, chemical products in the process of being manufactured. The total

cost of Westwood's Plan for orderly shut down was $60,260.

30.    HSBC refused to fund the Plan for orderly shut down, and Westwood's

management was unable to undertake necessary measures, such as properly disposing of

hazardous chemicals and materials at the Site. Westwood's management repeatedly requested

that HSBC provide funds to implement the shut down Plan. HSBC insisted that Westwood shut

down immediately without further action. Westwood's management repeatedly requested that

HSBC maintain the heat and electricity in the facility buildings for the coming winter months in order to preserve the facility for sale and to prevent chemical containers and pipes from freezing. HSBC's acts and omissions resulted in the release and threat of release of hazardous substances, necessitating emergency response and removal by state and federal regulators.

### HSBC's Refusal to Fund Completion of Chemical Products in Progress and Refusal to Ship Finished Chemical Products

31.     Following HSBC's seizure of Westwood's operating funds and the cessation of operations at the Site, Westwood asked HSBC for funds to ship out finished goods for customers in accordance with outstanding orders. This shipment would have realized additional revenue by Westwood and HSBC. HSBC refused to authorize the shipment of finished goods after demanding a letter from Westwood acknowledging that HSBC's actions "shall not be considered an act of control over operations of [Westwood] by HSBC." Westwood did not provide such a letter to HSBC.

32.     The finished chemical products that HSBC refused to authorize for shipment contained hazardous substances. HSBC's refusal to release the minimal funds necessary to ship these finished chemical products resulted in the materials being abandoned and disposed of at the Site. HSBC's acts and omissions resulted in the release and threat of release of hazardous substances, necessitating emergency response and removal by state and federal regulators.

33.     Westwood's management also requested funds to complete certain chemical products in the process of being manufactured, known as "work-in-progress goods," and to satisfy outstanding customer orders. Westwood and HSBC would have realized additional

9

revenue as a result of the completion and shipment of the work-in-progress goods.  HSBC again refused to fund completion of the work-in-progress goods.

34.    The uncompleted work-in-progress goods contained hazardous substances and hazardous waste.  HSBC's refusal to release the funds necessary to complete and ship the work-in-progress goods resulted in these materials being abandoned and disposed of at the Site. HSBC's acts and omissions resulted in the release and threat of release of hazardous substances, necessitating emergency response and removal by state and federal regulators.

### HSBC's Negotiations With Westwood's Prospective Purchasers

35.    During October and November 2004, HSBC negotiated directly with prospective purchasers for the sale of Westwood.  Representatives of Westwood were not included in these negotiations.  By about mid-November 2004, HSBC had reached an agreement for the sale of Westwood and the Site.  Under the terms of the sale, HSBC's note and loan would be satisfied. Like Westwood's management, the purchaser urged HSBC to maintain heat in the buildings at the Site to avoid the freezing of chemical containers and pipes.

### Abandonment of the Westwood Site

36.    HSBC's seizure of Westwood's operating cash and its refusal to approve and release funds for continued operation resulted in Westwood being shut down.  On or about October 25, 2004, Westwood ceased operations and laid off its 70 employees.  Hundreds of containers of hazardous waste and hazardous substances were abandoned and disposed at the Site.

37.    Neither Westwood nor HSBC notified local, State or federal officials of the environmental threat posed by the abandonment and disposal of hundreds of containers of hazardous waste and hazardous substances at the Site.

38.    In or about early November 2004, the heat and electricity in the buildings at the Site were turned off. HSBC was repeatedly urged to fund the maintenance of power in the buildings to prevent freezing of chemical containers, pipes, and the fire suppression system. HSBC refused to continue to fund even minimal heat and electricity.

**HSBC's Continued Operation of the Westwood Facility**

39.    HSBC repeatedly went to the Westwood Site during October, November and December 2004. At that time, hundreds of containers and tanks filled with hazardous waste and hazardous substances, some of them labeled as such, were abandoned in the buildings and in the yard behind the buildings. At that time, the heat in the buildings had been turned off and there was evidence that some of the pipes were freezing or had burst. The sprinkler heads in the fire suppression system had broken and the basement in the buildings was flooded. Numerous containers of hazardous waste and hazardous substances were partially frozen and/or leaking onto the ground behind the buildings.

40.    On or about December 13, 2004, representatives of HSBC and a heating and plumbing contractor HSBC had retained visited the Site. The contractor thereafter provided HSBC with a quote for winterizing the building, restoring the heating system, and draining the pipes, including those related to the fire suppression sprinkler system. HSBC's contractor advised against draining the pipes in the sprinkler system "for safety reasons." Draining the pipes would have caused a significant chemical fire hazard and would have violated the Town of

Wallkill Code. The contractor advised HSBC of the dangerous conditions of the Site, including multiple pipe "freeze ups" in the buildings.

41.    HSBC contacted a second contractor and requested a quote for draining the pipes and the fire suppression system. The second contractor confirmed that the pipes in the system were frozen. On or about December 27, 2004, the second contractor submitted a quote to HSBC recommending repair of the system, rather than draining it, as HSBC had planned. At some point, the pipes in the buildings at the Westwood Site were drained.

42.    By letter dated December 22, 2004, HSBC advised Westwood that it "was prepared to advance funds" to Westwood to cover the costs associated with turning on the heat and electricity at the Site and acknowledged that "damage from the cold, etc. is setting in." HSBC did not in fact advance funds to Westwood.

43.    By letter dated December 23, 2004, Westwood responded to HSBC that when the Bank took control of Westwood's finances and refused to continue funding heat in the building, the Bank's actions caused "an unnecessary burden of repair and cleanup costs," which should not be charged against Westwood's loan. Westwood suggested that HSBC had liability for those damages.

44.    Despite the dangerous and deteriorating condition of the Site, HSBC failed to notify DEC or other local, State or federal officials of the threat posed by the abandonment of hundreds of containers of hazardous waste and hazardous substances, frozen pipes and an inoperable fire suppression system.

45.    HSBC knew or should have known that Westwood was a chemical manufacturing company that produced hazardous waste and hazardous substances as a result of operations,

12

which required special handling, treatment, storage and disposal. HSBC knew or should have known that Westwood's operations included the necessity of paying costs for environmental compliance, including proper storage disposal of solid and hazardous waste. HSBC was repeatedly told, and knew or should have known, that the heat and fire suppression system at the Site would freeze in the absence of heat and electricity in the building. HSBC knew or should have known that abandoned containers of hazardous waste and hazardous substances would freeze and leak onto the ground.

46.    HSBC's actions in taking control of Westwood's finances, in refusing to fund an orderly shut down plan, in refusing to fund shipment of finished chemical products and the completion of work in progress, in retaining contractors to perform work at the Site, and in otherwise exercising control over the Site, directly and/or indirectly caused the abandonment, disposal, release, and threat of release of hazardous waste and hazardous substances to the environment from the Site. HSBC ignored its legal obligation to exercise due care when exerting such authority and control over the Site. HSBC ignored its legal obligation to report the release or threat of release, or the spill and discharge of hazardous substances and hazardous waste to the environment to DEC and other local, State and federal officials.

**HSBC's Bankruptcy Filing**

47.    On or about January 28, 2005, HSBC and two other creditors filed an involuntary bankruptcy case against Westwood in the United States Bankruptcy Court for the Southern District of New York (Case No. 05-35177 CGM). On or about February 11, 2005, Westwood filed a voluntary petition for liquidation under Chapter 7 of the Bankruptcy Code in the same court (Case No. 05-35298). On or about April 8, 2005, the Bankruptcy Court entered an order

consolidating the involuntary and voluntary cases. The Bankruptcy Court thereafter appointed a
Chapter 7 trustee to administer the case.

### Federal, State and Local Response Actions

48.     On or about February 8, 2005, the Town of Wallkill Building Inspector inspected
the Westwood Site and observed substances leaking from containers in the yard directly onto the
ground. He detected fumes emanating from the basement of the building, saw that the basement
was flooded and that chemical containers had broken and spilled there, and observed that fire
sprinkler heads were broken and that the fire suppression system was not in working order. The
Wallkill Building Inspector immediately contacted HSBC. HSBC denied any responsibility for
the Westwood Site. HSBC acknowledged the Site's dangerous condition but referred the
Wallkill Building Inspector to Westwood's management. The Building Inspector then contacted
DEC and other emergency responders including the New York State Police, the Orange County
Hazardous Materials Team, and the local Fire Department.

49.     On or about February 10, 2005, DEC went to the Westwood Site with other
emergency responders, including the New York State Police Explosives Operations Division.
DEC and the emergency responders found that the Site had been completely abandoned. The
power in the buildings was turned off. The water main that fed the fire suppression system had
been turned off. Sprinkler heads were broken and the fire suppression system was not
operational. Hundreds of abandoned chemical containers, drums, totes and large chemical tanks
of varying sizes and conditions of deterioration had been abandoned inside the buildings and in
the yard behind the buildings at the Site. Some containers were freezing or had frozen; some
were leaking or at risk of rupturing and releasing their contents; some containers had no lids and

14

the contents were evaporating. There was evidence that chemical substances had been released, spilled and discharged to the environment.

50.    Sampling of the containers revealed that many were filled with "hazardous waste" within the meaning of ECL § 27-0901(3) and 6 NYCRR Parts 371.3 and 371.4. Sampling also revealed that many containers were filled with "hazardous substances," as that term is defined in CERCLA Section 101(14), 42 U.S.C. § 9601(14), ECL § 37- 0103 and 6 NYCRR § 597.

51.    DEC and the New York State Police declared the Site a potential explosives emergency because of the instability of the labeled contents of certain containers. DEC and the other emergency responders determined that there had been releases of hazardous substances and hazardous wastes to the environment. DEC determined that the Westwood Site posed an imminent threat to human health and the environment requiring immediate action. DEC also determined that the Site was in significant violation of numerous environmental laws and regulations, including those governing the disposal and release of hazardous substances and hazardous waste.

52.    Based on these findings, on or about February 11, 2005, DEC hired an emergency contractor to (1) stabilize certain containers and properly ship them for disposal at a permitted facility; (2) move containers of labeled hazardous wastes inside a building to avoid further deterioration and releases; (3) repair and restore electricity, heat and the fire suppression systems; and (4) provide security personnel at the facility 24 hours a day, seven days a week.

53.    Due to the magnitude of the threat posed by the Site, on or about February 22, 2005, DEC requested that the United States Environmental Protection Agency ("EPA") provide

additional support to the emergency removal and response action at the Site.  On or about March 14, 2005, the EPA continued the emergency response and removal action that DEC had initiated.

54.    DEC and the EPA have incurred response costs as a result of the disposal, release, and threatened release of hazardous waste and hazardous substances caused by the abandonment of hundreds of chemical containers at the Site.  The State and DEC has incurred response and enforcement costs in excess of $200,000.  EPA has incurred approximately $3 million in response and enforcement costs.

55.    On or about March 31, 2005, DEC issued a Notice of Violation ("NOV") to Westwood's management, including Emma Masset, which recited numerous violations of law at the Westwood Site and stated DEC's finding that the Site posed a significant threat to human health and the environment.  The NOV demanded immediate action to address the violations and the threat posed by the Site.  Westwood's management failed and refused to respond to the NOV.

56.    The State then commenced an investigation into the dealings between Westwood and HSBC.

57.    On or about April 26, 2006, the Chapter 7 trustee filed an adversary proceeding complaint against HSBC and others in the United States Bankruptcy Court for the Southern District of New York alleging, *inter alia,* liability under CERCLA for the disposal and release of hazardous substances at the Westwood Site.

58.    On July 10, 2006, EPA filed an administrative claim in the Westwood bankruptcy for response costs incurred in cleaning up the Westwood Site.

59.     On September 22, 2006, the State filed an administrative claim in the Westwood bankruptcy for response costs incurred in responding to the Westwood Site, and for civil penalties for violations of law for the conditions there.

60.     On March 21, 2006, the Bankruptcy Court approved the settlement of certain claims and causes of action in the Westwood bankruptcy, including those by the Chapter 7 trustee against HSBC.  The Court approved payment by the estate of a portion of EPA's claims related to response costs, a portion of the State's claims related to civil penalties, and a portion of HSBC's claims as the purported secured creditor of Westwood.  Neither EPA's nor the State's claims were fully satisfied in the bankruptcy proceeding.

## FIRST CAUSE OF ACTION:
## CERCLA LIABILITY FOR RESPONSE COSTS

61.     HSBC is a "person" as that term is defined in CERCLA Section 101(21), 42 U.S.C. § 9601(21).

62.     Hazardous substances have been disposed of, released, and/or threatened to be released at the Westwood Site, as those terms are defined in CERCLA Section 101(22), 42 U.S.C. § 9601(22).  The disposal and release of hazardous substances has caused soil and groundwater contamination and has necessitated response actions by DEC and EPA.

63.     The Westwood Site is a "facility" as that term is defined in CERCLA Section 101(9), 42 U.S.C. § 9601(9), where hazardous substances were abandoned, disposed, released and/or threatened to be released to the environment.

64.     From August 2004 to February 2005, HSBC participated in the management of Westwood and exercised control of the Westwood Site.  HSBC is an "operator" of the Westwood

17

Site, as that term is defined in CERCLA Section 101(20), 42 U.S.C. § 9601(20), and operated the

Site at a time when hazardous substances were disposed of and released to the environment

within the meaning of CERCLA Section 107(a), 42 U.S.C. § 9607(a).

65.    HSBC's actions do not fall within the exemption from liability provided for

lenders in CERCLA Section 107(a), 42 U.S.C. § 9607(a).  HSBC did not undertake any of the

activities that otherwise may protect lenders from CERCLA liability, as set forth in CERCLA

Section 101(20), 42 U.S.C. § 9601(20).

66.    The disposal and release of hazardous substances into the environment at the Site

has caused the State and EPA to incur "response costs" within the meaning of CERCLA Section

101(25), 42 U.S.C. § 9601(25).  These costs have been incurred in a manner that is not

inconsistent with the National Contingency Plan, 40 C.F.R. Part 300.

67.    As an operator of the Westwood Site, HSBC is liable for the State's response

costs as set forth in CERCLA Section 107(a)(1) and (2), 42 U.S.C. § 9607(a)(1) and (2),

including, but not limited to, the costs associated with investigation, remediation, monitoring,

oversight, enforcement, and all legal actions taken as a result of the release or threat of release of

hazardous substances at the Site.

68.    HSBC is strictly, jointly and severally liable for the costs incurred by the State in

responding to the release and threat of release of hazardous substances at the Site.

## SECOND CAUSE OF ACTION:
### VIOLATION OF STATE HAZARDOUS WASTE LAWS

69.    HSBC is a "person" within the meaning of ECL § 27-0901(7).

18

70.    ECL §§ 27-0913 and 27-0914 prohibit the release and disposal of hazardous waste except at a properly permitted facility.  Hazardous wastes and hazardous substances were abandoned at the Site and therefore were "disposed" and/or "released" to the "environment" within the meaning of ECL § 27-0901(2).  DEC's hazardous waste regulations, 6 NYCRR § 370.2(48), define "disposal" to mean "the abandonment, discharge, deposit, injection, dumping, spilling, leaking or placing of any solid waste, including hazardous waste, into or onto the lands or waters, of the State, so that such waste or hazardous waste or any related constituent thereof may enter the environment . . . ."

71.    The acts and omissions of HSBC caused the abandonment, disposal and release of hazardous waste at the Site, which was not a properly permitted facility.  Such abandonment constitutes the illegal disposal of hazardous waste in violation of ECL §§ 27-0913, 27-0914, and ECL § 71-2705 and 6 NYCRR Part 373.

72.    ECL § 27-0907 and 6 NYCRR Part 373 set forth the applicable standards for hazardous waste handling, storage, and disposal. The abandonment and disposal of hazardous waste at the Site was in violation of these standards.

73.    6 NYCRR § 373-3.2 provides that the owner and/or operator of a hazardous waste facility shall comply with strict operational requirements in the handling, treatment, storage and/or disposal of hazardous waste.  HSBC's actions were in violation of these requirements.

74.    6 NYCRR § 373-3.3 provides that the owner and/or operator of a hazardous waste facility shall maintain the facility in a manner that minimizes or prevents the possibility of fire, explosion, or release of hazardous waste or hazardous waste constituents to the soil, air, or

surface water, and thereby threaten human health. HSBC's actions were in violation of these requirements.

75.    ECL § 71-2705(1) provides that any person who violates the foregoing provisions of ECL Article 27, or any rule or regulation set forth in 6 NYCRR Parts 372 and 373, shall be liable for a civil penalty of $37,500 for each violation, and an additional penalty of $37,500 for each day such violation continues.

76.    HSBC violated the provisions of ECL §§ 27-0913, 27-0914, and 6 NYCRR §§ 372 and 373 by abandoning, disposing of, and otherwise causing the release of hundreds of containers of hazardous waste and hazardous substances at the Westwood Site commencing on or about October 25, 2004 and concluding upon the removal and proper off-site disposal of such waste by the State and EPA. HSBC is therefore liable for the foregoing civil penalties.

### THIRD CAUSE OF ACTION:
### VIOLATION OF STATE HAZARDOUS SUBSTANCE LAWS

77.    ECL § 37-0107 prohibits the discharge or release to the environment of substances hazardous or acutely hazardous to public health, safety or the environment. The acts and omissions of HSBC caused the discharge and release to the environment of hazardous and/or acutely hazardous substances, as set forth in 6 NYCRR Part 597 and 40 C.F.R. Part 302.

78.    6 NYCRR § 596.6 requires the owner or operator of chemical bulk storage tanks containing hazardous substances to undertake an immediate response action, investigation, and corrective action upon the discovery of a release in order to protect human health, safety and the environment. HSBC had a duty to undertake an immediate response action, investigation and

corrective action as required by 6 NYCRR § 596.6. HSBC failed to undertake such action in violation of 6 NYCRR § 596.6.

79.    ECL § 71-3703 provides that any person violating ECL § 37-0107 or 6 NYCRR Part 596 shall be liable for a civil penalty not to exceed $2,500 for each violation and an additional $500 penalty for each day the violation continues. HSBC has violated ECL § 37-0107 and 6 NYCRR 596.6 commencing on or about October 25, 2004 and continuing until the removal and proper disposal of such waste by the State and EPA.

80.    HSBC was directly, actively and knowingly involved in the acts or omissions that led to the abandonment, disposal and release of hazardous substances and the consequent violations of ECL § 37-0107 and 6 NYCRR § 596.6. HSBC made decisions directly related to the disposal and release of hazardous substances at the Site. HSBC is liable for civil penalties for violations of such laws.

### FOURTH CAUSE OF ACTION:
### FAILURE TO REPORT RELEASES

81.    ECL § 17-1743 requires any person in actual or constructive possession of more than 1,100 gallons of any chemical liquid which, if released to the environment, would pollute the lands or waters of the State, including groundwater, to report any such release, discharge or spill of any amount of such liquid immediately to DEC. The DEC regulation applicable to the reporting of spills and releases of hazardous substances to the environment, 6 NYCRR § 595.3, requires that any person with actual or constructive control or possession of a hazardous substances, or who has knowledge of a release, must report the release to the DEC within two hours of discovery if such release may reasonably be expected to result in a fire with potential

21

off-site impacts, an explosion, or injury to other persons. 6 NYCRR § 595.1(12) defines "release" to include any direct or indirect spilling, leaking, leaching, or disposing, so that the hazardous substance *may* enter the environment.

82.     Between about November 1, 2004 and February 5, 2005, HSBC was in actual or constructive possession of the Site, including thousands of gallons of chemical bulk liquids that were abandoned and otherwise disposed of there.  These chemical liquids were hazardous substances within the meaning of 6 NYCRR § 597, and were in a quantity exceeding 1,100 gallons.

83.     Between on or about November 1, 2004 and February 5, 2005, HSBC knew or should have known of the freezing of chemical containers and the abandonment and release of hazardous substances to the environment at the Site.  HSBC had a duty to timely report such abandonment and release to DEC.  During that time, HSBC failed to timely report such abandonment and release to DEC as required by ECL § 17-1743 and 6 NYCRR § 595.3.

84.     Pursuant to ECL § 71-1943, the failure of HSBC to report the abandonment and release of hazardous substances to the environment is a violation of ECL § 17-1743 and 6 NYCRR § 595.3.  Each day HSBC failed to report the release of hazardous substances to DEC constitutes a separate violation of ECL § 17-1743.  Pursuant to ECL § 71-1943, HSBC, Masset, Giovanniello are liable for civil penalties of up to $3,750 per day for each violation.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court:

(A)     On the **FIRST CAUSE OF ACTION**, find and declare that HSBC is an "operator" of the Site at the time hazardous substance were disposed, released and/or threatened

to be released to the environment within the meaning of CERCLA Section 107(a), and is strictly, jointly and severally liable for the State's response costs pursuant to CERCLA §§ 107(a) and 113(g)(2);

(B)     On the **FIRST CAUSE OF ACTION**, order HSBC to reimburse the State for all past and future response costs incurred at the Site that are not inconsistent with the National Contingency Plan, including all costs of enforcement and pre-judgment interest;

(C)     On the **SECOND, THIRD, AND FOURTH CAUSES OF ACTION** find HSBC liable for violations of ECL §§ 27-0913, 27-0914, 37-0107, 17-1943 and 6 NYCRR Parts 372, 373, 595, 596 and 598, and direct HSBC pay civil penalties to the State for such violations.

(D)     Order such other relief as the Court deems just and appropriate.

Dated: April 12, 2007
      Albany, New York

                        ANDREW M. CUOMO
                        Attorney General of the State of New York
                        Attorney for Plaintiffs

By:                        
                        MAUREEN F. LEARY
                        Assistant Attorney General
                        Bar Roll No. ML3866
                        (Admitted USDC/SDNY February 18, 1993)
                        New York State Department of Law
                        Environmental Protection Bureau
                        The Capitol
                        Albany, New York 12224
                        (518) 474-7154
                        (518) 473-2534 (fax)
                        Maureen.Leary@oag.state.ny.us